UNITED STATES DISTRICT COURT
for the SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **AMY COTTRELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| *vs.* | ) CAUSE NO.  1:11-cv-341-SEB-DKL |
| | ) |
| **OTSUKA AMERICA** | ) |
| **PHARMACEUTICAL, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**ENTRY**

**Defendant's Motion to Dismiss [doc. 22]**

Plaintiff Amy Cottrell was employed as a pharmaceutical sales representative for defendant Otsuka America Pharmaceutical, Inc. ("Otsuka").  During her employment, Otsuka's marketing ethics and compliance policies required employees to report known or suspected violations of the policies and prohibited any adverse actions against employees who, in good faith, made such reports. In July 2010, Ms. Cottrell reported to her supervisor that she suspected a colleague had committed violations of the policies by forging the signatures of healthcare providers on a roster of attendees of a sales-promotion conference.  At the end of November 2010, Otsuka terminated her employment ostensibly for falsely reporting that she made sales calls on a customer.  Because Ms. Cottrell believes that her termination was actually in retaliation for reporting her colleague's violation of Otsuka's policies, she has sued Otsuka for breach of contract and promissory estoppel.  Otsuka now moves to dismiss both claims for failure to state a claim.

When ruling on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6),

> we take "all well-pleaded allegations of the complaint as true and view [ ] them in the light most favorable to the plaintiff." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir.2010). To satisfy the notice-pleading standard of the Federal Rules of Civil Procedure, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In other words, the plaintiff's complaint must be sufficient to provide the defendant with "fair notice" of the plaintiff's claim and its basis. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
>
> The Supreme Court also instructs us to examine whether the allegations in the complaint state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'. . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services*, 536 F.3d 663, 668 (7th Cir.2008) (emphasis in original), *quoting Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir.2008). But a plaintiff's claim need not be probable, only plausible: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 (internal quotation omitted). To meet this plausibility standard, the complaint must supply "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Id.*

*Independent Trust Corp. v. Stewart Information Services Corp.*, 665 F.3d 930, 934 -35 (7th Cir. 2012).

Otsuka has attached documents to its motion that were not attached to the pleadings, which ordinarily requires the Court to convert the motion to one for summary judgment and afford Ms. Cottrell an opportunity to present additional pertinent material. Fed.R.Civ.P. 12(d). However, an exception applies in this case:

> Federal Rule of Civil Procedure 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."

2

> Fed.R.Civ.P. 10(c). It is also well-settled in this circuit that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." "[T]his is a narrow exception" to the general rule that when additional evidence is attached a motion to dismiss, "the court must either convert the 12(b)(6) motion into a motion for summary judgment under Rule 56 . . . or exclude the documents attached to the motion to dismiss and continue under Rule 12."

*188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (citations omitted). *Rosenblum v. Travelbyus.com, Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002); *MCI Worldcom Network Services, Inc. v. Atlas Excavating, Inc.*, No. 02-C-4394, *Memorandum Opinion and Order*, 2005 WL 130076, *9 (N.D. Ill., Feb. 23, 2005). Dismissal on the basis of statements in a document attached to a complaint or unattached but referred to therein is appropriate only if the plaintiff relies on the statements to form the basis a claim or part of a claim. *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004) (attachments to complaint); *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998) (same); *188 LLC*, *supra* (material not attached to complaint). The documents attached to Otsuka's motion are referred to in Ms. Cottrell's Complaint, are central to her claims, and are expressly relied on by her as a basis for her claims.

## Allegations

Ms. Cottrell began working for Otsuka as a "medical representative" in June 2007. Otsuka had a long-standing agreement with Bristol-Myers Squibb Co. ("Bristol-Myers") for developing and commercializing the prescription medication Abilify. In August 2009, Ms. Cottrell partnered with Eric Brown, a Bristol-Myers employee, as "co-promotion colleagues" to promote Abilify to healthcare providers. She was promoted to Neuroscience Specialist in October 2009. Up until the events resulting in her termination, Ms. Cottrell's performance reviews reflected that she was

3

meeting expectations and had a good track record.

**Conduct codes.**  Various laws, industry guidelines, and corporate codes of conduct were in effect at the time.  It was illegal for pharmaceutical companies to offer healthcare providers kickbacks, bribes, gifts, or other benefits in order to induce them to purchase or prescribe particular medications.[1]

Bristol-Myers had in force its *U. S. Pharmaceuticals Compliance and Ethics Code of Conduct Policy* ("*Bristol-Myers Policy*").  It's purpose was to build and maintain a culture of compliance and ethical behavior.  Bristol-Myers required its alliance partners, including Otsuka, to make the *Bristol-Myers Policy* available to their employees or to comply with standards that were substantially comparable with it.  The *Bristol-Myers Policy* required employees to promptly report concerns about business practices or individual misconduct, including violations that "may have happened or might happen," to Bristol-Myers' Office of Compliance and Ethics.  The *Policy* references the *Pharmaceutical Research Manufacturers Association Code on Interactions with Healthcare Professionals* ("*PhRMA Code*") and the *OIG* [Office of the Inspector General of the Department of Health and Human Services] *Compliance Guidance for Pharmaceutical Manufacturers* ("*OIG Guidance*").

The *PhRMA Code* contains, in part, guidelines regarding venues and per-attendee dollar limits for promotional events for healthcare providers.

---

[1] No citations to a criminal code were provided in the Complaint or in the present briefing.

4

The *OIG Guidance* advised employers that, in order for compliance programs to work, employees must be able to report problems and, in order to encourage communication, confidentiality and non-retaliation policies should be developed and distributed to employees and employees should be able to report potential instances of fraud and abuse without fear of retribution.

Otsuka and the OIG entered into a *Corporate Integrity Agreement* ("*CIA*") for a five-year term commencing March 2008.[2] [Doc. 26-1.] Under the *CIA*, Otsuka agreed that its *Business Conduct Policy* shall continue to set forth **(1)** the requirement that all persons who perform promotional and product-services-related functions shall be expected to report suspected violations of any federal health-care program and FDA [U. S. Food and Drug Administration] requirements or Otsuka's own Policies and Procedures, and **(2)** Otsuka's commitment to non-retaliation for such reports and to confidentiality and anonymity with respect thereto. *CIA* § III.B.1.c. and d. Otsuka also agreed, to the extent it had not already done so, to establish a disclosure program that **(1)** included a mechanism to enable individuals to disclose issues or questions associated with Otsuka's policies, conduct, practices, or procedure with respect to a federal health-care program believed by the individual to be a potential violation of law, **(2)** emphasized a non-retaliation policy and included a mechanism for anonymous reporting, and **(3)** established a procedure for investigating disclosures and conducting internal reviews of the allegations and ensuring proper follow-up. *CIA* § III.E. "As a contractual remedy," Otsuka and the OIG agreed to the imposition of stipulated financial penalties for any failure by Otsuka to comply with the *CIA*. *CIA* § X.A. The penalties included $2,500 for

---

[2] Contemporaneous with the *CIA*, Otsuka entered into a settlement agreement with the United States, the nature of which is not described in the *CIA*, the pleadings, or the present briefing. Otsuka's agreement to the *CIA* also was a condition precedent to Otsuka entering into additional settlements with various states. *CIA* § I.

each day Otsuka fails to establish and implement the required written code of conduct and disclosure program, *id*. § X.A.1.c. and f., and $1,000 for each day Otsuka fails to fully and adequately comply with any obligation of the *CIA*, *id*. § X.A.7.

Otsuka had in effect a *Business Conduct Policy*. [Doc. 22-1 at 50-69 (June 2005 version); doc. 22-2 (June 2009 version).] The *Business Conduct Policy* "requires employees to report any known or suspected violations of company policies to their supervisor or to the Compliance Officer. Additionally, our policies strictly prohibit any adverse action against any person who, in good faith, reports known or suspected compliance issues." [Doc. 22-1 at 51-52.][3] Under the *Business Conduct Policy*, employees are required to report any known or suspected violations of law, ethics, or company policies:

> "[Otsuka] expects the following from each employee . . . . : Promptly report to the Company any violations of law, regulations, ethical principles or Company policies that come to your attention, and cooperate fully in any audit, inquiry, or investigation by the Company;"

*Business Conduct Policy* (June 2009 version) at 5 (internal pagination). *Id*. at 14 ("Employees are required to report violations of the BCP [*Business Conduct Policy*] and assist the Company, when necessary, in investigating violations").

> Disciplinary action will be taken when . . . [a]n employee deliberately fails to report a violation or deliberately withholds relevant or material information concerning violation of the BCP . . . .

*Id*.

---

[3] This description of the *Business Conduct Policy*, also quoted in Ms. Cottrell's Complaint, ¶¶ 25, 26, is from a three-page introduction to Otsuka's *Comprehensive Compliance Program*, of which the *Business Conduct Policy* is only a part. It is not a quotation from the *Business Conduct Policy* itself.

6

> Since this BCP deals with ethics, an employee's reporting responsibility is mandatory. If an employee becomes aware of a violation of [Otsuka's] BCP, he/she must take appropriate steps to bring the matter to the attention of the individuals listed above.

*Id*. at 14-15.

> Due to the nature of this BCP, it is important to emphasize that conduct which is in violation of the BCP, including a failure to report a violation, will result in appropriate disciplinary action.

*Id*. at 15. The *Business Conduct Policy* also prohibits retaliation:

> The Company prohibits retaliation against an employee who, in good faith, seeks help or reports known or suspected violations. Any reprisal or retaliation against an employee because the employee in good faith reported a violation or suspected violation is strictly forbidden and is, itself, an act subject to disciplinary action including potential termination of employment. Confidentiality will be maintained to the extent reasonably possible given the Company's responsibility to fully investigate any report of improper conduct.

*Id*. at 15.[4]

Otsuka maintained on its website a toll-free number for reporting known or possible violations. The page includes the statement: "You do not have to give your name. Otsuka adheres to a non-retaliation policy."

**Ms. Cottrell's report of violations.** On June 16, 2010, Ms. Cottrell's co-promotion colleague from Bristol-Myers, Eric Brown, held an Abilify Promotion Program for health-care providers. Following such a Promotion Program, the initiating salesperson is required to make two reports:[5] first, he must access a website and identify the attendees; second, he must fax the paper

---

[4] The 2005 version of the *Business Conduct Policy* does not include the last sentence. [Doc. 22-1 at 67.]

[5] The source of these requirements is not alleged.

7

roster that includes the attendees' signatures, the speaker's signature, the food and beverages receipts, and the joint-venture attendees. The two reports are compared for accuracy and checked for compliance with the *PhRMA Code*, laws, and other policies.

Payments for meals for health-care providers is one of the areas that is scrutinized pursuant to the laws, industry guidelines, and corporate policies aimed at combating kickbacks. The *PhRMA Code* includes guidelines regarding venues and per-attendee spending limits for meals and promotional programs. Otsuka had in force a policy titled *Meals to Facilitate Interactions with Healthcare Professionals* ("*Meals Policy*"), whose purpose was to ensure that meals provided to healthcare providers are appropriate and consistent with the *PhRMA Code* and laws. The *Meals Policy* applied to all employees and "Field Sales Representatives," such as both Ms. Cottrell and Mr. Brown, and to all "Otsuka Colleagues," which included Mr. Brown in its definition. In December 2009, Ms. Cottrell signed that she acknowledged and had read the *Meals Policy*.

The *Meals Policy* provided that meals must be of "modest value as judged by local standards and within company meal limits." The total meal cost — including food, beverages, taxes, and tips, but excluding reasonable and customary room charges and expenses for audio-visual equipment — for an out-of-office speaker program was capped at $125 per health-care provider attendee. The *Bristol-Myers Policy* limit was $100 per attendee. In addition, the *Meals Policy*, the *PhRMA Code*, and the *Bristol-Myers Policy* provide that the per-attendee cost must be modest by local standards, which in most cities meant less than the $125 absolute limit.

Ms. Cottrell did not attend Mr. Brown's Promotion Program but learned later, from two of the named attendees whose signatures appeared on Mr. Brown's faxed roster, that they did not attend

8

the Program, had not signed the roster, and were not aware that their purported signatures appeared on the roster. These two non-attendees identified their purported signatures as forgeries. Being familiar with the signatures of other providers whose names appeared on the roster, Ms. Cottrell believed that other signatures were forgeries as well. Ms. Cottrell believed that Mr. Brown had committed unethical and fraudulent acts in violation of company policies for the purpose of disguising that, without the forged attendees, he violated the per-attendee spending limits.

On July 9, 2010, Ms. Cottrell reported to Robert Stuart, her District Manager, that she suspected Mr. Brown of fraudulent violations.

**Ms. Cottrell's termination.** Unknown to Ms. Cottrell at the time, Mr. Stuart had a personal friendship with Mr. Brown. After her report, there was a deterioration in communications between Mr. Stuart and Ms. Cottrell, and between Mr. Brown and Ms. Cottrell, and Mr. Brown attempted to exclude Ms. Cottrell from marketing activities.

Later, when Ms. Cottrell inquired about the status of the investigation, Mr. Stuart told her that he had passed it on to his boss, Karen Foote, the Regional Sales Director. In September 2010, Mr. Stuart told Ms. Cottrell that the investigation was starting over because the Bristol-Myers compliance officer who had been investigating the report — Mr. Brown having been an employee of Bristol-Myers — had left the company. Later, Mr. Stuart informed Ms. Cottrell that the investigation was complete. No result is alleged.

Otsuka[6] terminated Ms. Cottrell on November 30, 2010, informing her that it was because

---

[6] Hereafter, the Complaint does not identify the responsible individuals at Otsuka.

it believed that she had not made calls on a Dr. Qazi as she had reported "based upon the fact that Cottrell did not appear to recognize Dr. Qazi when Dr. Qazi came out of her office across the room from where Cottrell was working on her computer during a Field Contact ride with Stuart." Complaint ¶ 71. Ms. Cottrell explained that, because she was not wearing her usual glasses while at the computer, she did not recognize Dr. Qazi until she came closer to where Ms. Cottrell was sitting. On that same day, after learning of the purported reason for terminating Ms. Cottrell, Dr. Qazi wrote a letter to Otsuka informing it that Ms. Cottrell had consistently called on her over the years and had developed a business relationship with her staff.

Ms. Cottrell was not terminated for Otsuka's stated reason but in retaliation for her reporting the suspected fraudulent activity of Mr. Brown.

**Claims**

Ms. Cottrell asserts two claims. Count 1, for breach of contract, alleges that Otsuka's mandatory reporting and non-retaliation policies constituted a contract between Otsuka and Ms. Cottrell which meant that it could not terminate her for reporting, in good faith, suspected violations of the company's policies. By terminating her in retaliation for her report of Mr. Brown's suspected violations, Otsuka breached the contract. Count 2, for promissory estoppel, alleges that Otsuka promised that it would not retaliate against Ms. Cottrell for reporting violations; it expected her to, and she did, reasonably rely on that promise to report Mr. Brown's suspected violations; she was damaged as a result; and injustice can be avoided only by enforcing the promise. Ms. Cottrell demands damages for lost wages, lost bonus opportunities, lost insurance benefits, lost retirement benefits, and impairment of her ability to work.

Ms. Cottrell's suit is being heard under the diversity jurisdiction of the Court. The parties do not dispute that Indiana law governs the sustainability of her claims.

## Discussion

**A. Breach of Contract.**

Otsuka moves to dismiss Ms. Cottrell's breach-of-contract claim because she was an at-will employee and Indiana law does not recognize an exception to at-will employment for policies stated in employee handbooks.

"If there is no definite or ascertainable term of employment, then the employment is at-will, and is presumptively terminable at any time, with or without cause, by either party." *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 717 (Ind. 1997). "[I]n Indiana, the presumption of at-will employment is strong" and the Indiana Supreme Court is "disinclined to adopt broad and ill-defined exceptions to the employment-at-will doctrine." *Id*. *Jarboe v. Landmark Community Newspapers of Indiana, Inc.*, 644 N.E.2d 118, 121 (Ind. 1994) ("The doctrine is deeply rooted in Indiana jurisprudence"). Ms. Cottrell does not dispute that her employment with Otsuka did not have a definite or ascertainable term of employment. She argues, however, that Otsuka's mandatory reporting requirement and non-retaliation promise justifies an exception to Indiana's strong at-will doctrine.

Indiana has recognized three exceptions to the at-will doctrine: first, when an employee provides adequate independent consideration for an employment contract; second, as a matter of public policy, when a finding that employment is at-will contravenes a clear statutory expression of a right or duty; and, third, when promissory estoppel applies. *Orr*, 689 N.E.2d at 718. In this

11

Count, Ms. Cottrell argues that the first and second exceptions apply to her claims.

She argues that the dilemma an employee faces between complying with a mandatory-reporting requirement and being subject to termination at-will, and the unfairness of an employer promising protection for mandatory reports but enforcing termination at-will supports recognition of a new public-policy exception to the at-will doctrine. Public-policy exceptions to the doctrine are rare and narrow; in fact, over the history of the doctrine, the Indiana Supreme Court and Courts of Appeals have recognized only two public-policy exceptions: when an employee has been terminated for **(1)** filing a worker's compensation claim and **(2)** refusing to commit an illegal act for which he is subject to personal penal liability. *Orr*, 689 N.E.2d at 718; *Meyers v. Meyers*, 861 N.E.2d 704 (Ind. 2007); *Ryan v. Underwriters Laboratories, Inc.*, No. 1:06-cv-1770-JDT-TAB, *Entry on Defendant's Motion to Dismiss Plaintiff's First Amended Complaint*, 2007 WL 2316474 (S.D. Ind., Aug. 8, 2007).

A federal court sitting in diversity must apply the law as it predicts the highest court of the forum state would apply it. *Association Benefit Services, Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). Ms. Cottrell asks this Court to recognize a new application of the public-policy exception to the at-will doctrine, but federal courts are particularly loathe to enter such territory.

> When faced with a novel question of state law, federal courts sitting in diversity have a range of tools at their disposal. First, when the intermediate appellate courts of the state have spoken to the issue, we shall give great weight to their determination about the content of state law, absent some indication that the highest court of the state is likely to deviate from those rulings. *See Woidtke v. St. Clair County, Illinois*, 335 F.3d 558, 562 (7th Cir. 2003). We also shall consult a variety of other sources, including other "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir.1980); *see*

> *generally* Dolores K. Sloviter, *A Federal Judge Looks at Diversity Jurisdiction*, 78 Va. L.Rev. 1671 (1992) (discussing the challenges facing federal courts in applying uncharted areas of state law). In the absence of any authority from the relevant state courts, we also shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide. *See Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir.2004).
>
> In the end, however, the plaintiffs must come forward with some authority to support their view that they have a right to the relief they seek because, as we have stated, we have "limited discretion . . . with respect to untested legal theories brought under the rubric of state law." *A.W. Huss Co. v. Cont'l Cas. Co.*, 735 F.2d 246, 253 (7th Cir.1984). Without state authority to guide us, "[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path (at least until the [state] Supreme Court tells us differently).". *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.1994) (en banc); *see also Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir.2000) ("Federal courts are loathe to fiddle around with state law. Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims."); *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir.2000) (adopting an interpretation of state law which, between two possible options, "take[s] the approach that is restrictive of liability").[5]
>
>> [5] We have applied this restrictive approach to a plaintiff's novel theory of liability under state law even where the plaintiff had no choice but to litigate his claim in federal court. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir.2000) (noting that even where "state law . . . is stunted by the ability of [defendants] to remove cases under diversity jurisdiction . . . that does not justify the federal courts imposing a new tort claim" on a state).

*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635-36 (7th Cir. 2007).

No Indiana court has recognized the public-policy exception that Ms. Cottrell urges. The Supreme Court specifically declined in *Orr* to answer the question whether policies included in employee handbooks — as were Otsuka's mandatory-reporting and non-retaliation policies — convert an at-will employment relationship to a good-cause relationship. Although presented with the issue multiple times, Indiana's Supreme Court and Courts of Appeals have steadfastly declined

to expand the at-will doctrine's public-policy exceptions. In this legal landscape, we, too, must decline Ms. Cottrell's request to create a novel application of state law.[7]

In addition, the Indiana Supreme Court in *Orr* indicated that, even had it declared that an employee-handbook exception were possible, the clear disclaimers in that case would have rendered the exception inapplicable. In the present case, Otsuka's employee handbook and policies contained clear disclaimers:

> This handbook is for information only. It is not an employment contract. Nothing in this handbook and nothing at any time communicated to you about your rights as an employee, regardless of the source, limits in any way your right to resign from your employment with [Otsuka] at any time for any reason or your employer's right to terminate your employment at any time for any reason.

Employee Handbook and Corporate Compliance Manual at 3 [doc. 22-1 at 4].

> Otsuka America Pharmaceutical, Inc. reserves the right to modify, revise or alter any policy, procedure, or condition related to employment at its sole discretion and at any time without notice and without revision of the Business Conduct Policy. The information contained in the Policy can be changed or revoked unilaterally by the Company at any time and is not all-inclusive. The contents of the Policy are intended for informational use only and do not create or constitute a contract of employment. Employment at [Otsuka] is on an at-will basis and nothing contained in the Policy should be construed as a promise or guarantee of continued employment.

*Business Conduct Policy* at 2. Ms. Cottrell also signed a form certifying that she received and understood Otsuka's employee handbook and stating that she "acknowledge[s] that this handbook is neither a contract of employment nor a legal document." [Doc. 22-3 at 2.]

Finally, *Orr* defined the public-policy exception as applicable when a "clear statutory

---

[7] Ms. Cottrell's argument relies heavily on decisions applying the laws of the states of Maryland and Washington. While the factual contexts of the cases might be similar to this one, the legal contexts of both jurisdictions' law are substantially different and, therefore, inapposite.


expression of a right or duty" would be contravened by enforcement of the at-will doctrine. In this case, Otsuka's corporate policies do not qualify as "statutory expressions of a right or duty." Ms. Cottrell repeatedly characterizes Otsuka's policies as implementations of the requirements of the *CIA* reached with the OIG, presumably in an attempt to give the policies the status of laws and more likely to support a public-policy exception. However, the *CIA* is not a statute and apparently was a bargained-for agreement, not unilaterally imposed by the OIG as a statute. Even so, the *CIA* is an agreement only between Otsuka and the OIG, and it provides for its own enforcement through the schedule of daily penalties. There is no provision in the *CIA* authorizing the OIG to require Otsuka to reverse or modify any individual personnel decisions. There is no warrant in the *CIA* for recognizing a new public-policy exception to the at-will doctrine in this case.

Ms. Cottrell next argues that the first exception to the at-will doctrine — adequate independent consideration — also should apply to her breach-of-contract claim. But she merely asserts that there was both mutuality of obligation and consideration for Otsuka's policies because she was obligated to report suspected violations and, in return, Otsuka was obligated to not terminate her for doing so. But both policies were unilateral statements by Otsuka to its employees. Ms. Cottrell does not allege any bargained-for personal promise by her to report violations because she wanted a promise of retaliation protection in exchange. At any rate, she provided no Indiana authorities recognizing that these types of employee-handbook policies qualify as adequate and independent consideration to overcome the strong presumption of employment at-will. On this argument and the apparent state of Indiana law, we again decline Ms. Cottrell's invitation to recognize a novel application of Indiana law.

Ms. Cottrell's breach-of-contract claim fails to state a claim under Indiana law.

**B. Promissory estoppel.**

The elements of the promissory-estoppel exception to Indiana's employment at-will doctrine are adopted from the *Restatement* (*Second*) *of Contracts* § 90(1) (1981):  "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001).

The Indiana Supreme Court addressed the scope of the exception and the remedies that are available thereunder in *Jarboe*. The promise in *Jarboe* took the form of an employer's grant of indefinite medical leave to its employee, Jarboe. The employer's policy placed a three-month cap on sick leave for any one incident. Nevertheless, in 1981, Jarboe was granted five months of sick leave for knee surgery and, in 1984, he was granted four months of leave for a second knee surgery. In 1988, Jarboe requested three months of leave for a full knee replacement and his employer told him to take as long as he needed because his health was the most important consideration. Upon learning that Jarboe could potentially require more than three months off work, his employer notified him that if he did not report to work after three months, he would be terminated. Jarboe was not able to return by the three-month deadline and he was terminated. He continued to receive medical coverage and long-term disability benefits after his termination until his physician released him to work later that year. Jarboe sued his employer, claiming that it was estopped from terminating him for not returning to work within a shorter time than it had already promised his sick leave would last.

The Indiana Supreme Court held that, under a promissory-estoppel theory, recovery is

limited to reliance damages; an employee is not entitled to expectancy damages:

> The doctrine of promissory estoppel may be available to an at-will employee, but the remedy is limited to damages actually resulting from the detrimental reliance and will not include the benefit of altering the employment status from an at-will relationship to a permanent one which requires just cause for termination. In contrast to the view arguably suggested by the language used by our Court of Appeals, we decline to authorize the use of promissory estoppel as a basis for general wrongful discharge damages.
>
> The plaintiff contends that the facts favorable to him as summary judgment non-movant indicate that the defendants made a definite promise that plaintiff's job would be waiting for him when he came back following rehabilitation; that in reliance on this promise, the plaintiff did not delay his surgery and did not "negotiate some other change or term for the leave with the employer"; and that, to prevent injustice, the defendants "should be estopped from breaking their promise." To the extent that the plaintiff's request for estoppel seeks to compel the defendants to resume their employment of the plaintiff, or seeks damages in the form of lost wages following his discharge, such requested relief represents expectancy damages, not reliance costs, and thus is not recoverable. Because Jarboe was released by his physician in December, any estoppel of Landmark [his employer] from breaking their alleged promise of continued employment would then cease. Landmark could have discharged Jarboe immediately thereafter without incurring further liability.
>
> Thus, any lost-wage damages to which Jarboe may be entitled on a theory of promissory estoppel would be limited to those incurred between the date of actual termination and the date of his release to return to work, less any disability benefits actually received by the plaintiff for this period of time. Relief awarded shall not include the restoration of his at-will employment nor damages for lost wages following the date of his medical release to return to work.

*Jarboe*, 644 N.E.2d at 122.

Otsuka argues that, by seeking lost wages, lost bonus opportunities, lost insurance benefits, and lost retirement benefits, Ms. Cottrell is seeking expectancy, not reliance, damages, which are not recoverable under promissory estoppel. Even if she were able to prove that Otsuka made a non-retaliation promise on which it expected her to rely and that she reasonably relied thereon in reporting Mr. Brown's suspected violations, *Jarboe* prevents the remedies that she seeks. Ms.

17

Cottrell responds that her claim is distinguishable because, while Jarboe alleged that his employment had been changed from at-will to permanent, she does not allege that Otsuka's non-retaliation promise altered her at-will status and she does not seek expectancy damages for life. She seeks only those reliance opportunity costs (including, *inter alia*, lost wages and benefits) that a jury would find that she lost as a result of Otsuka's termination based on its determination of a reasonable amount of time that she would have remained at Otsuka, which is the same determinations that are made in any case where an at-will employee has been terminated for an actionable reason.

We find that *Jarboe* applies to, and forecloses, Ms. Cottrell's claim. The distinction between reliance and expectancy damages that it declared does not depend on how an employee articulates the status of her employment, at-will or permanent, but upon what cause of action or legal theory they proceed. How Jarboe characterized his employment (*e.g.*, that his employer's promise of continued employment converted his at-will status to permanent employment) was irrelevant. The Court declared that, under a promissory-estoppel theory, he could recover only reliance damages, not expectancy damages. In the present case, although Ms. Cottrell argues that she does not allege that she was a permanent employee, she can still obtain only reliance damages by way of her claim of promissory estoppel; she cannot recover what she expected to earn in salary or benefits from Otsuka, for any period of time in the future. The promise in *Jarboe* was not to take adverse action against Jarboe for taking an extended sick leave (*i.e.*, to hold his job for him until his rehabilitation was done) and the promise in this case was not to take adverse action against Ms. Cottrell for reporting Mr. Brown's violations. The Supreme Court held that Jarboe could recover only reliance damages from the date of his termination until he was released to work, because that happened to be the scope of the promise made to him and the measure of his reliance costs, but he could not

recover lost wages or other expectancy damages thereafter. If Jarboe's employer had terminated him on the day that he returned to work or even some days after his return to work because he exceeded the three-month leave limit, there is no indication in *Jarboe* that he could have recovered lost wages and benefits for any period of time after his termination. Perhaps Ms. Cottrell's expectancy damages would be recoverable under the public-policy or adequate-consideration exceptions to the at-will doctrine, but not under the promissory-estoppel exception.

Alternatively, the clear disclaimers that foreclosed Ms. Cottrell's claim that Otsuka's non-retaliation statements in the employee handbook justify an exception to her at-will status also doom any reasonable reliance by her on those statements. In addition, the language of Otsuka's non-retaliation statement is not in terms of a direct promise or guarantee to employees but is in terms of an instruction forbidding the taking of adverse actions against employees who report violations and it expresses only disciplinary consequences as an enforcement of the prohibition:

> The Company prohibits retaliation against an employee who, in good faith, seeks help or reports known or suspected violations. Any reprisal or retaliation against an employee because the employee in good faith reported a violation or suspected violation is strictly forbidden and is, itself, an act subject to disciplinary action including potential termination of employment.

*Business Conduct Policy* at 15. Thus, the employee-handbook statement on which Ms. Cottrell alleges she relied is imperative rather than promissive.

Ms. Cottrell's promissory-estoppel claim fails to state a claim under Indiana law.

## Conclusion

Because Ms. Cottrell's Complaint fails to state a claim under Indiana law, Otsuka's motion to dismiss [doc. 22] is **GRANTED** and the Complaint [doc. 1] is **DISMISSED WITHOUT**

19

**PREJUDICE**.  Ms. Cottrell may move for leave to file a new complaint, with proposed complaint attached, no later than **April 20, 2012**.  If she does not seek leave by that deadline, judgment will be entered dismissing this case with prejudice.

**SO ORDERED.**

Date:  03/29/2012

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution:

John R. Ates
Ates Law Firm, P.C.
j.ates@ateslaw.com

Ellen E. Boshkoff
Faegre Baker Daniels, L.L.P., Indianapolis
ellen.boshkoff@faegrebd.com

Debra H. Miller
James R. Fisher
MILLER & FISHER LLC
fisher@millerfisher.com
miller@millerfisher.com